UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATTON BOGGS LLP,<br>2550 M Street, NW<br>Washington, DC 20037<br><br>Plaintiff,<br><br>v.<br><br>CHEVRON CORPORATION,<br>6001 Bollinger Canyon Road<br>San Ramon, CA 94583<br><br>Defendant. | CIVIL ACTION NO.: _____<br><br>COMPLAINT FOR<br>DECLARATORY JUDGMENT |

Patton Boggs LLP ("Patton Boggs" or "Plaintiff"), as and for its Complaint for Declaratory Judgment herein, states as follows:

### PRELIMINARY STATEMENT

1. This case arises out of an environmental and human rights action against Defendant Chevron Corporation ("Chevron"), which was originally filed in the United States on behalf of Ecuadorian citizens injured by the contamination resulting from Chevron's historic oil extraction operations in that country. After nine years of litigation and two appeals, Chevron succeeded in obtaining a dismissal of the action based on the company's promise that it would not challenge the jurisdiction of the Ecuadorian courts upon the re-filing of the case in Ecuador. In 2003, a popular action was filed in Lago Agrio, Ecuador (the "Lago Agrio Litigation") against

Chevron on behalf of a group of plaintiffs from the Ecuadorian Amazon (the "Ecuadorian Plaintiffs").[1] The litigation remains pending in Ecuador as of the filing of this Complaint.

2. In December 2009, Chevron began instituting proceedings in multiple district courts throughout the United States pursuant to 28 U.S.C. § 1782 ("§ 1782 proceedings"), seeking discovery purportedly in aid of its defense of the Lago Agrio Litigation and in aid of a private international arbitration between Chevron and the Government of Ecuador, in which Chevron, among other relief, is asking the panel of three private individuals to order the Ecuadorian government to shut down the Lago Agrio Litigation. As one district court recently noted, Chevron's § 1782 proceedings have "quickly spiral[ed] out of control." *Chevron Corporation v. Mark Quarles*, No. 3:10-cv-00686, Dkt. 108, at 2-3 (M.D. Tenn.). In an invocation of this limited discovery tool unprecedented in its magnitude, Chevron has to date filed actions in sixteen (16) jurisdictions, sought discovery from at least twenty-five (25) separate individuals or entities affiliated with the Ecuadoran Plaintiffs, obtained over 275,000 pages of document discovery, and taken eleven (11) depositions. In 2010, Patton Boggs agreed to represent the Ecuadorian Plaintiffs and to assist them in opposing Chevron's abuse of the § 1782

---

[1] The Ecuadorian Plaintiffs include: Daniel Carlos Lusitand Yaiguaje, Venancio Freddy Chimbo Grefa, Miguel Mario Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Simon Luistande Yaiguaje, Armando Wilmer Piaguaje Payaguaje, Javier Piaguaje Payaguaje, Fermin Piaguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaguaje, Reinaldo Lusitande Yaiguaje, Maria Victoria Aguinda Salazar, Carlos Grega Huatatoca, Cataline Antonia, Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Clide Ramiro Aguinda Aguinda, Luis Armandao Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Angel Amanta Milan, Franciso Matias Alvarado Yumbo, Olga Gloria Grefa Cerda, Narcisa Tanguila Narvaez, Bertha Yumbo Tanguila, Lucrecia Tanguila Grefa, Francisco Victor Tanguila Grefa, Rosa Teresa Chimbo Tanguila, Maria Clelia Reascos Revelo, Heliodoro Pataron Guaraca, Maria Viveros Cusangua, Lorenzo Jose Alvarado Yumbo, Franciso Alvarado Yumbo, Jose Gabriel Revelo Llore, Luisa Delia Tanguila Narváez, Jose Miguel Ipiales Chicaiza, Hugo Gerardo Camacho Naranjo, Maria Magdalena Rodríguez, Elias Payahuaje Payahuaje, Lourdes Beatriz Chimbo

mechanism as a means to deplete the Ecuadorian Plaintiffs' limited resources and ostensibly to litigate a foreign case in the American courts.

3. Chevron has now begun to threaten Patton Boggs by alleging that because lobbying work was previously done by two persons who recently joined Patton Boggs – namely, former United States Senators Trent Lott and John Breaux – through the Breaux Lott Leadership Group, a conflict of interest exists.

4. Chevron's playbook has long been transparent – for seventeen (17) years, the company has done everything it can to avoid engaging on the merits, to obstruct the progress of the case, and to deprive the Ecuadorian Plaintiffs of legal representation and aid. Chevron's attempt to paralyze the Ecuadorian Plaintiffs' counsel with unmeritorious threats of disqualification is the latest move in Chevron's ongoing campaign to ward off anyone who dares to provide aid to the Ecuadorian Plaintiffs.

5. Chevron disregards the fact that the Rules of Professional Conduct as well as relevant case law and ethical opinions draw a clear distinction between pure lobbying work and legal services such that no conflict of interest could possibly arise by virtue of Patton Boggs' representation of the Ecuadorian Plaintiffs.

6. Notwithstanding the lack of basis underlying Chevron's threats, it has become quite clear that the company will not be content until there remains no attorney left in this country who will dare provide representation to the Ecuadorian Plaintiffs, lest their good name be dragged through the mud. Trying to prevent the Ecuadorian Plaintiffs from obtaining representation through intimidation and threats is not an acceptable way to defend a case – this abuse must end.

---

Tanguila, Octavio Cordova Huanta, Celia Irene Vivero Cusangua, Guillermo Payaguaje

7. Plaintiff therefore brings this civil action under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking declaratory judgment as to whether Patton Boggs should be disqualified from representing the Ecuadorian Plaintiffs simply by virtue of its acquisition of the lobbying firm the Breaux Lott Leadership Group that previously provided pure lobbying services, without more, to Chevron, notwithstanding the fact that the Breaux Lott Leadership Group's lobbying work is not governed by the conflicts provisions of the Rules of Professional Conduct or any other applicable set of rules.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332. The parties are of diverse citizenship, and the amount in controversy is in excess of $75,000.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Patton Boggs has its principal place of business in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

10. Plaintiff Patton Boggs is a limited liability partnership with its principal place of business in the District of Columbia. None of its partners reside in Delaware or California.

11. Defendant Chevron is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, CA 94583.

---

Lucitande, Alfredo Payaguaje, and Delfín Payaguaje.

## FACTUAL BACKGROUND

### The Lago Agrio Litigation

12. From 1964 to 1992, Texaco, Inc., subsequently acquired by Chevron, owned an interest in an approximately 1,500 square-mile concession in the Ecuadorian Amazon Basin that contained numerous oil fields and more than 350 well sites. From 1964 until at least 1990, Chevron's predecessor engineered and presided over what some experts believe is one of the worst oil-related environmental disasters the world has ever known, perhaps even larger in scope and impact than the Deepwater Horizon/BP Oil Spill. It deliberately dumped many billions of gallons of waste byproduct from oil drilling directly into the rivers and streams of the rainforest covering an area roughly the size of Rhode Island.

13. In 1993, the Amazon communities filed a federal class-action lawsuit against Chevron's predecessor, Texaco, in the United States District Court for the Southern District of New York, seeking "money damages under theories of negligence, public and private nuisance, strict liability, medical monitoring, trespass, civil conspiracy, and violations of the Alien Tort Claims Act," as well as "extensive equitable relief to redress contamination of the water supplies and environment." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

14. From the lawsuit's inception, Chevron fought vigorously to re-venue the case from the Southern District of New York to the courts of Ecuador, touting the virtues of the Ecuadorian justice system. The Court of Appeals for the Second Circuit ultimately agreed and dismissed the case on the condition that, when re-filed in Ecuador, Chevron would not challenge the jurisdiction of the Ecuadorian courts.

15. After final dismissal of the *Aguinda* action in 2002, the Ecuadorian Plaintiffs re-filed the case in Lago Agrio, Ecuador, and trial began in 2003. The case has been hotly

5

contested and vigorously defended by Chevron. Indeed, in May 2009, Chevron spokesman Donald Campbell articulated the company's litigation strategy: "We're going to fight this until hell freezes over. And then we'll fight it out on the ice." The case has now been litigated in Ecuador for approximately eight years.

<u>Chevron's Gamesmanship</u>

16. The Lago Agrio Litigation has been marred by Chevron's dubious litigation tactics designed to obstruct the progression of the case. For example, two of Chevron's attorneys in Ecuador were recently sanctioned for bombarding the court with frivolous and duplicative motions – on one occasion Chevron filed nineteen motions in thirty minutes – an attempt to exploit an Ecuadorian rule that requires judges to accept all motions into the proceeding within a certain, short time period or face recusal.

17. Chevron has also allegedly harassed and threatened judicial site inspection experts in the Lago Agrio trial and attempted to obstruct their field sampling by creating false security threats.

18. Due to threats from Chevron's affiliates in Ecuador, the Inter-American Court of Human Rights recently ordered the Government of Ecuador to provide the Ecuadorian Plaintiffs' legal team in Ecuador with bodyguards. Not surprisingly, Chevron's attempts to delay, obstruct, and intimidate are not confined to Ecuador – they have now carried over to the United States.

19. Notwithstanding the fact that Chevron fought desperately for years to move the case to Ecuador, since December 2009, Chevron has filed seventeen (17) separate § 1782 proceedings, in fifteen (15) different United States District Courts throughout the country, against the Ecuadorian Plaintiffs' current and former counsel, consulting experts, and their sub-consultants.

20. Chevron has targeted with § 1782 subpoenas no less than twenty-five (25) separate persons or entities affiliated with the Ecuadorian Plaintiffs

21. Upon information and belief, upon determining who will serve as the Ecuadorian Plaintiffs' local counsel in particular § 1782 United States jurisdictions, Chevron has contacted the attorneys and attempted to intimidate them into withdrawing their representation.

22. At depositions of the Ecuadorian Plaintiffs' consultants, Chevron's attorneys have attempted to intimidate the witnesses by asking, at the start of the deposition, whether these environmental consultants are familiar with various criminal statutes. The District of Colorado issued sanctions as a result of this abusive practice, ordering that those questions shall not be repeated in future depositions of witnesses there.

23. Most recently, Chevron initiated a § 1782 action designed to cripple the lead United States counsel for the Ecuadorian Plaintiffs at the most critical time in the case – namely, by burying him beneath a mountain of discovery including no less than sixty-eight document requests; occupying his time with preparing for and sitting for depositions; and attempting to paralyze him with threats of criminal prosecution and other disciplinary action.

24. It is not surprising that Chevron now threatens Patton Boggs, an international law firm with the capability of allowing the Ecuadorian Plaintiffs' to vigorously defend their interests against Chevron's army of lawyers. Indeed, prior to Patton Boggs' appearance in the case, the firm received a warning communicated through the media – from the American Lawyer on November 8, 2010: "More immediately, will the embarrassment be too great for the Am Law 100 firm that plaintiffs have said is on the verge of joining their team? '*Anyone jumping into bed with plaintiffs at this point needs to understand what they're signing on to*,' Chevron spokesman Kent Robertson said. '*They will be funding a fraudulent lawsuit.*'" (emphasis added).

The Breaux Lott Leadership Group

25. The Breaux Lott Leadership Group is a lobbying group headed by former Senators Trent Lott and John Breaux and provides lobbying services to clients in Washington, D.C. and throughout the country. The Breaux Lott Leadership Group is not a law firm and has not provided legal services or advice to its clients. The Breaux Lott Leadership Group made this fact well known to clients and prospective clients.

26. Prior to be acquired by Patton Boggs, the Breaux Lott Leadership Group entered into a Lobbying Services Contract with Chevron under which the parties agreed that the Breaux Lott Leadership Group would provide lobbying and strategic services—not legal services or advice—to Chevron in connection with certain matters.

27. The Breaux Lott Leadership Group did not agree to, and never did, perform legal work for Chevron. Instead, by virtue of the agreement between them, the Breaux Lott Leadership Group provided solely non-legal lobbying services to Chevron.

28. Chevron is well aware of the difference between lobbying services and legal services, as it likely employs hundreds of attorneys just in connection with the Lago Agrio Litigation.

29. As such, there was never an attorney-client relationship between the lobbying company of Breaux Lott Leadership Group and Chevron, and Chevron cannot state otherwise.

30. In July 2010, Patton Boggs acquired Breaux Lott Leadership Group to gain its lobbying capabilities.

Chevron's Most Recent Threat to Disqualify Patton Boggs

31. In 2010, Patton Boggs began representing the Ecuadorian Plaintiffs.

32. Patton Boggs recently entered an appearance in the Second Circuit Court of Appeals in connection with a § 1782 appeal in one of the many jurisdictions throughout the country where Chevron has been attempting to threaten the Ecuadorian Plaintiffs' legal team.

33. Within two days of that entry of appearance, by letter dated November 13, 2010, Chevron threatened Patton Boggs' partner James E. Tyrrell, Jr. that it may move to disqualify him and the Patton Boggs firm from representing the Ecuadorian Plaintiffs because of the pure lobbying work that the Breaux Lott Leadership Group performed for Chevron before it was acquired by Patton Boggs.

34. Thus, there is an actual case and controversy regarding whether or not a conflict of interest exists from Patton Boggs' representation of the Ecuadorian Plaintiffs, such that this Court may declare the rights and other legal relations of the parties with respect thereto.

## COUNT I – DECLARATORY JUDGMENT ACT: NO BASIS FOR DISQUALIFICATION

35. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 34 above as if set forth herein at length.

36. Defendant has frivolously and baselessly alleged that Patton Boggs' representation of the Ecuadorian Plaintiffs creates a conflict of interest that could result in disqualification of Patton Boggs and has threatened to disqualify Patton Boggs as counsel for the Ecuadorian Plaintiffs based on the Breaux Lott Leadership Group's prior lobbying efforts on behalf of Chevron. This is a transparent attempt to divert and distract the Ecuadorian Plaintiffs' legal team at a critical juncture in the case.

37. Under the relevant law, including applicable ethical opinions and the Rules of Professional Conduct, the work performed by the Breaux Lott Leadership Group was limited to mere lobbying services and was not in any way legal in nature, as the Breaux Lott leadership

9

Group was not a company engaged in the provision of legal services or advice. This fact was clearly communicated to Chevron.

38. The lobbying work performed by the Breaux Lott Leadership Group for Chevron is therefore not governed by the conflicts provisions of the Rules of Professional Conduct.

39. As such, no conflict of interest can exist by virtue of Patton Boggs' representation of the Ecuadorian Plaintiffs.

40. Plaintiffs are therefore entitled to a declaratory judgment that there is no basis for disqualification of Patton Boggs from its representation of the Ecuadorian Plaintiffs.

41. In addition, it would be impracticable for Patton Boggs to resist disqualification in the numerous jurisdictions in which § 1782 proceedings are now pending and any future jurisdictions where Chevron continues to file these proceedings.

**WHEREFORE**, Plaintiff respectfully demands judgment:

A) Declaring that the Breaux Lott Leadership Group's prior non-legal work for Chevron does not provide a basis for disqualifying Patton Boggs from representing the Ecuadorian Plaintiffs;

B) Awarding Patton Boggs all of its costs of suit, including attorneys' fees, to obtain the declaratory relief, which was necessitated by the frivolous allegations of Defendant and its Counsel; and

C)    Awarding to Patton Boggs such other and further relief as is just and proper.

                                              PATTON BOGGS LLP

By: /s/ Charles E. Talisman
Charles E. Talisman (D.C. Bar No. 367314)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC  20037
Phone:  (202) 457-6000
Fax:  (202) 457-6315
ctalisman@pattonboggs.com

Dated:  November 17, 2010

11